## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LILY TAYLOR, TIM TAYLOR, and**
**BONNIE TAYLOR,**

       **Plaintiffs,**

**v.**                                     **Case No. 1:23-CV-00821-MV-JHR**

**THE SANTA FE PUBLIC SCHOOL**
**BOARD OF EDUCATION,**
**RENEE SALAZAR-GARCIA, in her individual capacity,**
**HILARIO CHAVEZ in his individual capacity,**
**UNIVERSAL PROTECTION SERVICE, LP d/b/a**
**ALLIED UNIVERSAL SECURITY SERVICES,**
**AMEEN BENHALIM, and BADR EL-BADRI,**

       **Defendants.**

## FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiffs, by and through their attorneys, Egolf + Ferlic + Martinez + Harwood, LLC (Kate Ferlic and Ben Osborn, appearing), bring this Complaint for Damages against the above-named Defendants.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Lily Taylor is a resident of Santa Fe County. At the time of the incidents giving rise to this lawsuit, she was sixteen years old.

2.     Plaintiffs Bonnie Taylor and Tim Taylor are the parents of Lily Taylor. Bonnie Taylor is a resident of Santa Fe County. Tim Taylor is a resident of the State of Colorado.

3.     Defendant Santa Fe Public Schools Board of Education ("SFPSBOE") is a local governmental entity responsible under New Mexico law for adopting and developing policies, practices, and procedures in connection with the operation and administration of schools within

the Santa Fe Public School District. Santa Fe High School, located in Santa Fe, New Mexico, is in the Santa Fe Public School District.

4.    Defendant Hilario Chavez was, at all times material hereto, the Superintendent of Santa Fe Public Schools and a government official with policy-making and supervisory authority over SFPS, including Santa Fe High School.

5.    Defendant Renee Salazar-Garcia was, at all times material hereto, the Principal of Santa Fe High School with policy-making and supervisory authority over Santa Fe High School and its employees and students.

6.    SFPSBOE is a person for the purpose of 42 U.S.C. § 1983.

7.    SFPSBOE is a governmental entity for the purpose of the New Mexico Tort Claims Act.

8.    Universal Protection Service, LP d/b/a Allied Universal Security Services ("Allied Universal") is a California limited partnership with its principal places of business in Santa Ana, California and Conshohocken, Pennsylvania, and offices in Albuquerque and Las Cruces, New Mexico. Allied Universal provides contract security services involving, among other things, the provision of uniformed security officers at offices, retail establishments, schools, and warehouses. SFPSBOE contracted with Allied Universal to provide security services at SFPSD schools, including Santa Fe High School, where Allied Universal and its agents and employees operated under the authority and control of SFPSBOE. Allied Universal may be served with process by serving its registered agent, Corporation Service Company, at 110 E. Broadway St., Hobbs, New Mexico 88240.

9.    Defendant Ameen Benhalim is a private citizen over the age of eighteen and a resident of Santa Fe County.

10.    Defendant Badr el-Badri is a private citizen over the age of eighteen and a resident of Santa Fe County.

11.    The acts complained of herein occurred in Santa Fe County.

12.    Defendant SFPSBOE is located in Santa Fe County.

13.    Defendant SFPSBOE is responsible for its employees' and agents' actions, is a person for the purposes of 42 U.S.C. § 1983, and at all relevant times was acting under color of state law.

14.    New Mexico Statutes Section 22-5-4.3(B) obligates SFPSBOE to establish policies and procedures, including safety protocols and student disciplinary sanctions.

15.    This Court has personal jurisdiction over all parties to this complaint.

16.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1367.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in New Mexico and because at all relevant times SFPSBOE is a local governmental entity located in the State of New Mexico.

## **FACTUAL BACKGROUND**

### **Security at Santa Fe High School**

18.    SFPSBOE, through its agents and employees (collectively, "SFPS"), contracts with Allied Universal to provide security services at Santa Fe Public Schools facilities.

19.     By September 2021, SFPS had delegated to Allied Universal responsibility for patrolling Santa Fe campuses, including Santa Fe High School, for security risks. SFPS had further delegated to Allied Universal authority and responsibility to enforce SFPS safety policies.

20.     Nonetheless, SFPS maintained authority to control and supervise Allied Universal's conduct and to dictate the method and circumstances in which is provided security services. SFPS had, however, previously documented several instances in which Allied Universal's lapses and failures had created security risks to students, staff, and faculty.

21.     For example, Allied Universal security guards routinely missed patrols and check-ins at various SFPS campuses, including Santa Fe High School. These failures were documented in reports regularly submitted to SFPS in the course of business.

22.     Allied Universal's security guards at Santa Fe High School were notoriously derelict in their duties. Among students at Santa Fe High School, it was a common, well-founded belief that any transgression or infraction would be permitted provided that the Allied Universal security guards did not have to get out of their golf carts. And Allied Universal security guards' plain unwillingness to leave their golf carts meant that many violations of school policy and/or State law were effectively permitted.

23.     SFPS maintains a close campus policy at Santa Fe High School, with students presumptively prohibited from leaving campus and returning during school days, and with visitors screened before entry. Yet Allied Universal security guards and SFPS employees often refused or failed to enforce Santa Fe High School's closed campus policy in Fall 2021, with individuals free to enter and leave the campus, often passing by the security guards, who rarely, if ever, checked identification or campus passes.

24.     In several instances over the 2021-2022 school year, SFPS and Allied Universal permitted students to leave campus unmonitored and return to campus with alcohol that they would consume and share with other students on campus. At least two such instances resulted in assault, sexual assault and/or rape on campus. Other instances included students leaving campus and returning with weapons.

25.     Students also knew that there were areas of Santa Fe High School's campus entirely free of supervision, either by Allied Universal's security guards or by SFPS employees. These areas included the bathrooms inside the school, behind the music building, and in certain parking lots, specifically an area near the tennis courts and a set of porta-potties. These areas are prone to assaults, sexual misconduct, drug use, and fights.

26.     Since 2019, at least three student-on-student rapes or sexual assaults have occurred at Santa Fe High School in either the bathrooms or in the student parking lots; two of these incidents included the assailant student drugging or otherwise intoxicating the victim student.

27.     Despite the security risks caused by Allied Universal's lapses, SFPS, Superintendent Chavez, and Principal Salazar-Garcia took no action to correct Allied Universal's practices or boost patrols in campus areas prone to violence and misconduct.

28.     Despite Allied Universal's obvious and repeated lapses, failures, and omissions, including those alleged herein, SFPS increased Allied Universal's compensation in October 2021.

29.     SFPS, Superintendent Chavez, and Principal Salazar-Garcia also declined to set or implement any safety policy sufficient to protect against students known to be dangerous.

30.     And even when students were disenrolled or suspended for safety reasons, the lack of security at Santa Fe High School meant that such students could freely return to campus. On information and belief, in at least two instances in Fall 2021, disenrolled or suspended students were permitted to return to campus during school hours and assault current students.

31.     On information and belief, there were several instances over the last five school years in which students required by the Juvenile Probation Office to wear ankle monitors were left unsupervised at Santa Fe High School and permitted to leave or skip class and assault other students on campus.

32.     Throughout September 2021, Principal Salazar-Garcia also declined to require or enforce policy requiring teachers to conduct "roll calls" at the beginning of each period. And no policy required Santa Fe High School to report unexplained absences to parents. Thus, Santa Fe High School did nothing to monitor attendance or absence at each period. Santa Fe High School therefore had no procedures in place to identify whether and when a student was abducted.

33.     The accepted standard of care, however, is for attendance to be taken in each class and parents notified when their child misses a class without excuse. This standard ensures not only students' presence for their education, but also their safety. Santa Fe High School's failure to implement such an obviously necessary, basic safety procedure can only be described as deliberately indifferent.

34.     Similarly, in Fall 2021, Principal Salazar-Garcia and other Santa Fe High School employees also failed to require timely reporting to parents of incidents involving student safety. Students would be assaulted or threatened with no timely notice to their parents.

**The Assault on Ms. Taylor**

35.    In September 2021, Ms. Taylor was a sixteen-year-old junior at Santa Fe High School.

36.    Another student at Santa Fe High School, Defendant Badr el-Badri, was then on probation for an attempted murder shooting. El-Badri had a record of violence, on and off campus, of which SFPSD was aware.

37.    A juvenile court had ordered el-Badri to wear an ankle monitor as part of his probation for the community's safety.

38.    On information and belief, SFPS was aware of this judicial finding of dangerousness. Further, SFPS administrative regulations (AR 35) provide that a student charged with a crime "who wishes to continue his/ or her education during the pendency of his or her criminal proceedings must submit a written request to do so to the building principal," who shall then arrange student's placement in some alternative program, separate from the general student population.

39.    Despite this policy and despite Defendant el-Badri's serious criminal charge, SFPS, Superintendent Chavez, and Principal Salazar-Garcia elected to treat el-Badri just like any other student, subject to no monitoring or restrictions. Further, just like any other student, el-Badri was permitted to skip class and roam the school grounds without an employee taking note of his absence.

40.    Ms. Taylor and el-Badri were placed in the same first-period "Speech and Debate" class for the Fall 2021 semester. It was in this class that Ms. Taylor first met el-Badri

41.    From the first day of class, el-Badri began sexually harassing Ms. Taylor.

42.   The harassment began with sexual comments and insults, but quickly escalated to sexual assault, including el-Badri grabbing Ms. Taylor's bottom and groping her inner thigh in the classroom.

43.   El-Badri told other students to stay away from Ms. Taylor because she "belonged" to him.

44.   In one class, el-Badri showed Ms. Taylor a video, taken from a security camera at his home, of a S.W.A.T. squad raiding his house and arresting him for an attempted-murder shooting. Ms. Taylor understood this as a threat to intimidate Ms. Taylor.

45.   The sexual harassment and assaults happened in class and were witnessed by the teacher who relayed or should have relayed what she witnessed to higher officials, including Principal Salazar-Garcia.

46.   But the harassment continued unabated into Santa Fe High School's halls, in front of various school officials and employees, including Allied Universal security guards, over the course of two weeks.

47.   Ms. Taylor resisted this harassment and assault campaign, but SFPS employees declined to intervene to protect Ms. Taylor

48.   In early September 2021, el-Badri was suspended from school for insulting or threatening a teacher. Santa Fe High School, then, knew that it had to take disciplinary measures to protect its *teachers* from el-Badri, but it declined to take any measures to protect its students from him.

49.   On September 13, el-Badri's second day back at school following his suspension, he offered Ms. Taylor what he claimed was a Xanax around lunchtime. Nervous but under

leering pressure from el-Badri and his friends, Ms. Taylor accepted, mistakenly believing that she would be safe at school.

50.    The drug was in fact a bootlegged version of Xanax—Flualprazolam—which is more potent than Xanax and can operate as a powerful sedative with unpredictable effects.

51.    Ms. Taylor quickly became visibly disoriented, unsteady, and intoxicated.

52.    At this time, el-Badri approached Defendant Ameen Benhalim—another student at Santa Fe High School and a friend of el-Badri—with a visibly disoriented, unsteady, and intoxicated Ms. Taylor.

53.    El-Badri asked Benhalim if he and Ms. Taylor could borrow Benhalim's car, then parked in the Santa Fe High School parking lot, to skip class. El-Badri made his intentions clear: he wanted a space where he could take advantage of Ms. Taylor's intoxicated state and sexually assault her.

54.    Benhalim agreed, on the condition that he be paid $20.00 for el-Badri to "rent" his car for the purpose of assaulting Ms. Taylor. El-Badri paid Benhalim, and Benhalim gave el-Badri his car keys.

55.    El-Badri, in the middle of a school day at SFPSD's most populous high school, proceeded to take the visibly intoxicated Ms. Taylor across campus to Benhalim's car in one of Santa Fe High School's parking lots.

56.    El-Badri raped and assaulted Ms. Taylor in the car over the next several hours in the middle of a school day.

57.    Afterwards, he took Ms. Taylor—unconscious, half-clothed, and severely injured—to a porta potty. He left her there.

58.     So lax was security in the area that Ms. Taylor remained in the porta potty—unconscious, half-clothed, and severely injured—for at least thirty minutes before she was found, and even then she was found not by a Santa Fe High School or Allied Universal employee, but rather by a happenstance visitor.

59.     Ms. Taylor was then transported to a hospital for a toxicology treatment and sexual assault exam, which reflected that she had been drugged and raped.

60.     Ms. Taylor's injuries were directly and proximately caused by myriad policy failures at SFPS and Santa Fe High School.

61.     First, the parking lot where El-Badri raped Ms. Taylor has a history of student misconduct, including drug use and student-on-student violence.

62.     Given the history of violence and other misconduct in the area, the need for increased safety measures there should have been obvious to Principal Salazar-Garcia.

63.     But although SFPS had placed security cameras elsewhere on Santa Fe High School's campus, it had not done so at this misconduct-prone area. Nor did SFPS direct increased patrols in the area by Allied Universal, failing to heed the obvious need for regular patrols in the area, and it took minimal steps to ensure that Santa Fe High School's campus was in fact closed against unauthorized visitors or departing students. Nor did Allied Universal instruct its security guards to focus on these dangerous areas, much less maintain regular patrols in the routes that SFPS had requested.

64.     Second, SFPS took no action to protect Ms. Taylor from a known, specific danger of sexual violence—it took no attendance at the start of each class, and it took no action to monitor a student known to be dangerous to Ms. Taylor.

10

65.    Over the course of the assault, both Ms. Taylor and el-Badri were expected in classes, with no excuse or permission to leave campus.

66.    However, because Santa Fe High School teachers were not required to take attendance at each class, no SFPS employee even noted el-Badri's absence, much less thought to look for him.

67.    Despite Ms. Taylor's unexcused and uncharacteristic absence for several class periods, concurrent with the unexplained absence of a student known to be dangerous to her, no SFPS employee thought to look for her or ensure her safety. And because SFPS has no policy requiring parents to be notified upon a student's absence, Ms. Taylor's mother, Bonnie, was also deprived of the ability to ensure her daughter's safety or even know where she was in the middle of a school day.

68.    The need to monitor students' attendance generally should have been obvious given the openness of Santa Fe High School's campus, both the unauthorized visitors to campus and unauthorized student departures from campus.

69.    But the need to monitor Ms. Taylor should have been particularly obvious, given that she went missing at exactly the same time as another student known to have a propensity for violence and a history of violence against Ms. Taylor

70.    Instead, Santa Fe High School had *no* safeguards in place to protect against a student being kidnapped and raped without any official or employee even realizing that the student was missing over several hours.

71.    Superintendent Chavez, Principal Salazar-Garcia, and SFPS failed to issue or implement any policy or safety protocol at SFPS schools regarding missing students, and failed

to issue or implement any specific policy for the monitoring of students charged with crimes of violence or with a history of sexual violence.

72.    Not only did Principal Salazar-Garcia fail to issue or implement any policy or safety protocol regarding missing students, she failed to implement any policy to even notice when a student went missing.

73.    Principal Salazar-Garcia further failed to issue or implement any specific policy for the monitoring of students charged with crimes of violence or with a history of sexual violence at Santa Fe High School.

74.    Despite the obvious risks, SFPS, Superintendent Chavez, and Principal Salazar-Garcia failed to set any policy that would prevent students with known violent proclivities from roaming free on campus.

75.    Because of Defendants' blatant failures to implement obviously necessary safety policies, monitor el-Badri, intervene against el-Badri's serial sexual harassment against Ms. Taylor, inquire into Ms. Taylor's unexplained absence, patrol the parking lot and porta potty areas, or ameliorate the risks of violence and other crimes in the parking lot and porta potty area, Ms. Taylor was drugged and raped and left unconscious in porta potty within view of the school's principals' offices.

76.    So lax was security in the area that Ms. Taylor—in urgent need of medical care— was found only by happenstance by a visitor and not an employee of Santa Fe High School, despite Ms. Taylor being left, unconscious and half nude, in the porta potty for an extended length of time in view of the principals' offices.

77. Additionally, SFPS employees failed to timely notify Ms. Taylor's parents of her injury. Instead, when Ms. Taylor was not at her agreed-upon spot for being picked up after school by her mother, Bonnie Taylor had to call the Santa Fe Sheriff's Department to report her daughter as missing before she would be contacted by a SFPS employee, reporting that her daughter had been "found in a porta potty without a T-shirt, bra, or underwear on."

78. Ms. Taylor has suffered debilitating post-traumatic stress disorder, depression, and anxiety as a result of the assault. She was forced to withdraw from Santa Fe High School. As direct result of Defendants' actions, she has suffered serious injuries and has been deprived access to educational opportunities and benefits.

<u>Count I: Violation of the New Mexico Human Rights Act</u>
<u>Against SFPS</u>

79. Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

80. Plaintiffs state a claim for violation of the New Mexico Human Rights Act, NMSA 1978, Section 28-1-7.

81. The New Mexico Human Rights Act protects persons in public accommodations from discrimination on the basis of sex and gender identity.

82. The New Mexico Human Rights Act prohibits as an unlawful discriminatory practice "any person in any public accommodation to make a distinction, directly or indirectly, in offering or refusing to offer its services, facilities, accommodations or goods to any person because of . . . sex [or] gender identity[.]" *Id.*

83.    A public accommodations provider's deliberate indifference to a known risk of gender-based violence and harassment by an individual subject to the provider's control is unlawful under the New Mexico Human Rights Act.

84.    Santa Fe High School is a public accommodations provider within the meaning of the HRA.

85.    SFPS made a distinction in offering educational services to Ms. Taylor based on her sex and gender by refusing to protect her against a known risk of sexual violence.

86.    SFPS is liable for sexual assault and sexual harassment against its students that it anticipated or should have anticipated.

87.    Ms. Taylor has exhausted her administrative remedies under the New Mexico Human Rights Act.

88.    The limitations period for pursuing administrative remedies was tolled during Ms. Taylor's minority.

89.    As a result of SFPS's violations of the New Mexico Human Rights Act, Ms. Taylor has suffered personal injury, mental and emotional distress, and damages.

**Count II: Negligence Against SFPS, Chavez, and Salazar-Garcia**

90.    Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

91.    Defendant SFPS owes a duty to students to ameliorate, mitigate, or remove known dangers to students' safety.

92.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia knew that el-Badri posed a risk to other students if left unmonitored while on campus. They knew that el-Badri specifically posed a risk to Ms. Taylor

93.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia knew that the parking lot and porta potty areas at Santa Fe High School were prone to student misconduct, including violence and sexual violence.

94.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia knew that the standard of care for student safety involves taking attendance at each class and notifying parents of any unexplained absences, yet Defendants failed to adhere to this standard, enabling el-Badri to drug, kidnap, and rape Ms. Taylor during school hours, on school property, without any employee even noticing they were missing.

95.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia failed to take proper care to monitor el-Badri, failed to require Santa Fe High School to take attendance to monitor students' whereabouts while on campus, and failed to take proper care to monitor the parking lot and porta potty regions.

96.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia's negligence caused Ms. Taylor to be sexually assaulted on campus.

97.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia's governmental immunity is waived under NMSA 1978, Section 41-4-6 for negligent maintenance and operation of a building.

98.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia's actions and omissions constitute negligent operation and maintenance of a building, in that their failure to

15

monitor and supervise el-Badri and the parking lot and porta potty area created a condition on campus dangerous to students like Ms. Taylor

99.    As a result of SFPS, Superintendent Chavez, and Principal Salazar-Garcia's negligence, Ms. Taylor has suffered significant injuries and damages, including mental anguish and distress, emotional anguish and distress, physical pain and suffering, and other damages.

## Count III: Violation of the New Mexico Civil Rights Act
## Against SFPS

100.    Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

101.    Article II, Section 18 of the New Mexico Constitution provides, in relevant part, that "[n]o person shall be deprived of life, liberty or property without due process of law[.]" This provision generally mirrors the Fourteenth Amendment to the United States Constitution, both in text and in application by New Mexico courts. *Cf. State v. Gomez*, 1997-NMSC-006, ¶ 20, 122 N.M. 777, 932 P.2d 1.

102.    Like the Fourteenth Amendment, Article II, Section 18 of the New Mexico Constitution creates a substantive due process right. *See Morris v. Brandenburg*, 2016-NMSC-027, ¶ 19, 376 P.3d 836, 844. Substantive due process claims under Article II, Section 18 "inquire whether a statute or government action shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037, ¶ 50, 306 P.3d 457.

103.    Defendant SFPS created an unconscionably dangerous condition by refusing to intervene to protect Ms. Taylor against a student it knew was dangerous and who it knew had been regularly sexually harassing Ms. Taylor. Defendant SFPS further failed to monitor and

supervise el-Badri, permitting him to roam the campus unaccounted-for over several class periods. Despite Ms. Taylor's concurrent, unexplained absence, SFPS employees did nothing to search for either el-Badri or Ms. Taylor. Finally, SFPS failed to regularly take attendance which, in combination with its failure to maintain a closed campus at Santa Fe Public High School, created a direct and foreseeable risk of students being abducted without any official ever noticing.

104.    As a young girl, Ms. Taylor was particularly vulnerable to the risk presented by an unsupervised el-Badri.

105.    SFPS' deliberate refusal to take any protective action placed Ms. Taylor at a substantial risk of serious, immediate, and proximate harm, and this risk was obvious and known by SFPS.

106.    SFPS' conduct shocks the conscience and violates Ms. Taylor's substantive due process rights under Article II, Section 18 of the New Mexico Constitution.

107.    As a result of SFPS' conscience-shocking behavior, Ms. Taylor has suffered significant injuries and damages, including mental anguish and distress, emotional anguish and distress, physical pain and suffering, and other damages.

### Count IV: Discrimination in Violation of Title IX
### 20 U.S.C. §§ 1681 et seq. against SFPS

108.    Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

109.    Ms. Taylor was sexually assaulted and harassed by el-Badri, another student of SFPS.

110.    The risk of assault by el-Badri was obvious and apparent to SFPS, given el-Badri's criminal history and his history of sexually harassing and assaulting Ms. Taylor in front of SFPS employees, who reported this behavior to officials with the power to intervene but failed to take any action to protect Ms. Taylor.

111.    The risk of assault at Santa Fe High School's violence-prone parking lot and porta potty area was obvious and apparent to SFPS.

112.    SFPS had a duty to address this risk because student-on-student sexual assault is a form of sex discrimination prohibited by Title IX.

113.    Because of Ms. Taylor's sexual assault, she was forced to withdraw from school.

114.    SFPS and officials with actual knowledge of el-Badri's history had the authority to investigate and take corrective action to prevent the sexual assault.

115.    By its acts and omissions, SFPS was deliberately indifferent to Ms. Taylor's sexual assault and created a hostile educational environment for her.

116.    Ms. Taylor's sexual assault was so severe as to deny her an equal educational opportunity.

117.    SFPS' deliberate indifference to Ms. Taylor's risk of sexual assault proximately caused the denial of equal educational opportunities to Ms. Taylor

118.    As a direct and proximate result of Defendants' violation of Ms. Taylor's rights under Title IX, Ms. Taylor has suffered and continues to suffer losses of education opportunities and benefits, in addition to significant injuries and damages, including mental anguish and distress, emotional anguish and distress, physical pain and suffering, lost future earnings and earning capacity, and expenses for past and future medical and psychological care.

## Count V: Civil Rights Violations Under 28 U.S.C. § 1983 by
## SFPS, Chavez, and Salazar-Garcia.

119.    Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

120.    A "governmental official or supervisory employee may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1250 (10th Cir. 1999)

121.    State action for the purposes of § 1983 occurs when "a supervisor or employer participates in or consciously acquiesces in sexual harassment by an outside third party[.]" *Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir. 1994).

122.    Such deliberate acquiescence violates both substantive due process and equal protection rights under the Fourteenth Amendment. *See id.* (noting that it is clearly established that "a person who exercises the state's supervisory authority may be held liable for consciously acquiescing in sexually harassing conduct by a non-state actor over whom the state actor has authority"); *Woodward v. City of Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992) ("[S]exual harassment . . . can violate the Fourteenth Amendment right to equal protection of the laws.")

123.    SFPS Superintendent Chavez, and Principal Salazar-Garcia knew of el-Badri's violent past and knew that in September 2021 el-Badri required monitoring for other students' safety, specifically the risk of harm to Ms. Taylor and other girls at Santa Fe High School arising from an unmonitored, free-roaming el-Badri. SFPS, Superintendent Chavez, Principal Salazar-Garcia also knew that this dangerous student had been routinely sexually harassing Ms. Taylor, and that this behavior had only been escalating in severity.

124.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia further knew that the Santa Fe High School parking lots and porta potty were dangerous and that, if left unmonitored, were hospitable to precisely the kind of assault that Ms. Taylor suffered.

125.    But SFPS, Superintendent Chavez, and Principal Salazar-Garcia knew that Allied employees had routinely failed to provide sufficient security services, including at the parking lot and porta potty where Ms. Taylor was assaulted.

126.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia further refused to require Santa Fe High School teachers to regularly take attendance. And they refused to maintain a closed campus at Santa Fe High School.

127.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia refused to take any protective measures for other students' safety against assault by students like el-Badri with known violent proclivities.

128.    Together, these myriad deliberate failures created a virtual certainty that Ms. Taylor would be sexually assaulted by el-Badri.

129.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia's failure to train SFPS employees regarding the identification and creation of strategies, training, risk assessment, and planning against the risk of sexual assault by students like el-Badri constitutes deliberate indifference to that risk, which endangered all SFPS students.

130.    Principal Salazar-Garcia, who held policymaking authority at Santa Fe High School, created a policy—through refusal to take any protective measures for other students' safety— of allowing violent students like el-Badri to assault other students.

131.    SFPS, Superintendent Chavez, and Principal Salazar-Garcia's policy of inaction against a known risk of sexual assault directly endangered students like Ms. Taylor

132.    This risk was foreseeable and direct.

133.    This conscience-shocking policy of deliberate indifference against a known risk of gender-based violence violated Ms. Taylor's substantive due process and equal protection rights guaranteed by the Fourteenth Amendment.

134.    Ms. Taylor's substantive due process and equal protection rights against such deliberate indifference were clearly established in September 2021. *See, e.g.*, *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238 (10th Cir. 1999).

135.    Because Superintendent Chavez and Principal Salazar-Garcia created the policy of deliberate indifference that directly caused Ms. Taylor's sexual assault, and because Principal Salazar-Garcia and Superintendent Chavez held final policymaking authority on SFPS' behalf, SFPSBOE is liable for Ms. Taylor's constitutional injuries under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

### Count VI: Negligence Against Allied Universal

136.    Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

137.    By serving as the sole or primary security contractor for SFPS, Defendant Allied Universal assumed a duty to SFPS students, including Ms. Taylor, to take reasonable measures to ensure their safety on campus.

138.    Allied Universal owed a duty to SFPS students, including Ms. Taylor, to hire, train, and supervise employees to properly secure and protect the students while on campus.

21

139.    Allied Universal knew or should have known that its employees' failure to regularly patrol crime-prone areas at Santa Fe High School—SFPS' largest school—would create an unreasonable risk of injury to students.

140.    Allied Universal knew or should have known that its employees' failure to monitor ingress and egress at Santa Fe High School, ostensibly a closed campus, would create an unreasonable risk of injury to students.

141.    Allied Universal knew that its employees' routine disregard of student misconduct happening within their vicinity would create an unreasonable risk of injury to students.

142.    Allied Universal's employees failed to use ordinary care in ensuring the safety and security of students at Santa Fe High School. Allied Universal is liable to Plaintiffs for all related damages for the negligence of its employees acting within the scope of their employment.

143.    Allied Universal negligently hired, trained, and supervised its staff working at SFPS schools, and by negligently failing to assure the competency of employees, Allied Universal is liable to Plaintiffs for all related damages.

144.    As a result of the above-stated negligence, Allied Universal caused Ms. Taylor's injuries and damages.

145.    Allied Universal's acts and omissions, individually and through its agents or employees, were malicious, reckless, and/or wantonly disregarded Ms. Taylor, giving rise to punitive damages.

### Count VII: General Negligence and Negligent Entrustment Against Ameen Benhalim

146.    Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

147.   It would have been obvious to a reasonable person of Benhalim's age and experience that Ms. Taylor was intoxicated, unsteady, and disoriented when Defendant Badr el-Badri asked Benhalim for his car keys for the purposes of engaging in sexual misconduct with Ms. Taylor in Benhalim's car.

148.   A reasonably prudent person of Benhalim's age and experience would know that Ms. Taylor was incapable of consenting to sexual contact with el-Badri. Yet Benhalim entrusted his car to el-Badri for just that purpose.

149.   Furthermore, as el-Badri's friend, Benhalim was aware of el-Badri's propensity for violence.

150.   Benhalim owed a duty to Ms. Taylor not to take affirmative steps to facilitate her rape and sexual assault.

151.   By lending his vehicle to el-Badri and Ms. Taylor, Behalim assumed a duty not to unreasonably endanger their safety.

152.   By lending use of his car to el-Badri to facilitate el-Badri's sexual assault of Ms. Taylor, Benhalim breached his duty to Ms. Taylor.

153.   Benhalim's actions and omissions proximately caused Ms. Taylor's rape and sexual assault.

154.   As a direct and proximate result of el-Badri's actions, Ms. Taylor sustained serious and permanent injuries to her person, in an amount to be shown at trial.

### Count VIII: Sexual Battery Against Badr el-Badri

155.   Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

156.    Defendant Badr el-Badri did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Ms. Taylor's person, which would offend a reasonable sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Ms. Taylor's person that would offend a reasonable sense of personal dignity.

157.    Because of el-Badri's intentional drugging of Ms. Taylor and her resulting state of intoxication, and because of Ms. Taylor's age, Ms. Taylor was unable to, and did not and could not, give consent to such acts.

158.    As a direct and proximate result of el-Badri's actions, Ms. Taylor sustained serious and permanent injuries to her person, in an amount to be shown at trial.

159.    El-Badri's conduct was reckless, malicious, wanton, and willful and justifies imposition of punitive damages.

### Count IX: Loss of Consortium
### Against All Defendants

160.    Plaintiffs incorporate by reference all preceding paragraphs as though they were stated fully herein.

161.    Plaintiffs Tim Taylor and Bonnie Taylor have close and loving relationship with their daughter, Ms. Taylor.

162.    Ms. Taylor lived in the same home as Bonnie Taylor at the time of the assault and contributed to the household through her labor and love.

163.    As a result of Defendants' actions, Tim Taylor and Bonnie Taylor have been denied the companionship, society, comfort, aid, and protection of their daughter, Ms. Taylor.

164.   It was foreseeable that Tim Taylor and Bonnie Taylor would be harmed by a traumatic injury to their daughter as a result of the Defendants' wrongful acts.

165.   Defendants' negligent, wanton, reckless, willful, and/or intentional wrongful acts and omissions were the direct and proximate cause of Plaintiffs' loss of consortium.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request judgment in their favor and against all Defendants; damages to compensate them for injuries including mental anguish and distress, emotional anguish and distress, physical pain and suffering, loss of educational opportunities, lost wages and earning capacity, punitive damages, attorney fees and costs, pre- and post-judgment interest, and any other relief this Court may deem necessary and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Egolf + Ferlic +
Martinez + Harwood, LLC

By: _/s/ Kate Ferlic_____
Katherine Ferlic
Ben Osborn
123 W. San Francisco Street, Second Floor
Santa Fe, New Mexico 87501
(505) 986-9641
Kate@EgolfLaw.com
Ben@EgolfLaw.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of January, 2024, I filed the foregoing First Amended Complaint for Damages through the Court's online filing system, which caused all parties entitled to notice to be served by electronic means, as more fully reflected on the notice of electronic filing.

*/s/ Kate Ferlic*
Katherine Ferlic